# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| STANLEY BLACK & DECKER, INC. and THE BLACK & DECKER CORPORATION, | Case No. 20-cv-06808 |
| Plaintiffs, |  |
|  | Judge Robert M. Dow, Jr. |
|  | Magistrate Judge Susan E. Cox |
| v. |  |
|  | **DEMAND FOR JURY TRIAL** |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", |  |
| Defendants |  |

## DEFENDANT XG POWER'S ANSWER TO PLAINTIFFS' COMPLAINT

Defendant XG Power, named in the Complaint as Defendant No. 9, 10, 12, 30, 33, 34, and 37 hereby responds to the Complaint ("Complaint") filed by STANLEY BLACK & DECKER, INC. and THE BLACK & DECKER CORPORATION  ("Plaintiffs" or "SBD").

Defendant XGPower now provides Answers to the statements and allegations made by Plaintiffs in their Complaint,  Unless specifically admitted, all allegations in the Complaint are denied.

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq. 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331. This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

> **ANSWER:** Defendant admits this allegation as to appropriate Jurisdictional basis, but denies the commission of  acts that are within the purview or scope of such legislation.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial Internet stores operating under the Defendant Aliases and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit

versions of SBD's trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of SBD's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused SBD substantial injury in the State of Illinois.

> **ANSWER:** Defendant admits that it participates in marketing of products that target consumers for sale on the Internet and that includes marketing in the United States, including Illinois. Defendant admits that it offers its products to be shipped to the United States, including Illinois. All other allegations are denied, and Defendant specifically denies that it has committed infringement, counterfeiting or any other tortious acts in the course of its marketing.

3. This Court has personal jurisdiction over each Defendant in that each Defendant conducts significant business in Illinois and this Judicial District, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and this Judicial District.

> **ANSWER:** Defendant admits that it participates in marketing of products that target consumers for sale on the Internet and that includes marketing in the United States, including Illinois. All other allegations are denied. Defendant specifically denies that it has committed infringement, counterfeiting or any other tortious acts in the course if its marketing that would give rise to this litigation or would give rise to the accusations that would implicate personal jurisdiction in this matter.

## **INTRODUCTION**

4. This action has been filed by SBD to combat online counterfeiters who trade upon Plaintiffs' reputation and goodwill by selling and/or offering for sale products in connection with SBD's famous DEWALT trademarks. SBD owns two incontestable trademark registrations in the United States Patent and Trademark Office ("USPTO") for the DEWALT mark for use in connection with battery packs (collectively the "DEWALT Trademarks"). SBD also owns an incontestable trade dress registration in the USPTO for the DEWALT yellow and black color scheme for use in connection with battery packs (the "DEWALT Trade Dress").

> **ANSWER:** Defendant lacks knowledge or information sufficient to form a belief or understanding of the motivations of Plaintiffs in filing this case. Furthermore, Defendant denies the allegations of the validity and incontestability of Plaintiffs' asserted trademark, trade dress or other proprietary rights. All allegations of Paragraph 4 as to counterfeiting and/or trading on reputation and goodwill of Plaintiffs are denied as to Defendant

5. SBD is the owner of Trademark Registration Nos. 1,734,403; 1,734,404; and 3,064,666 (collectively, "the DEWALT Trademarks"). Attached hereto as **Exhibit 1** are true and correct copies of said registrations. These registrations are valid and subsisting and have become incontestable. SBD manufactures and sells DEWALT tools and accessories bearing the DEWALT Trademarks and DEWALT Trade Dress, which are valuable assets protecting the goodwill of the business and have never been abandoned.

> **ANSWER:** Defendant denies the validity and incontestability of Plaintiffs' asserted Trademarks and Trade Dress or any proprietary assets that are asserted in this matter. Defendant lacks sufficient information to admit or deny the validity of Plaintiffs' ownership of the asserted "Dewalt Trademarks" and "Dewalt Trade Dress." Further, Defendant lacks sufficient knowledge

or information to admit or deny the allegations in Paragraph 5 concerning the goodwill or

protection thereof with respect to Plaintiffs'' business.

6. In an effort to illegally profit from the DEWALT Trademarks, Defendants have created numerous

Defendant Internet Stores and designed them to appear to be selling authorized DEWALT Products.

    **ANSWER:** Defendant denies the allegations of Paragraph 6 of the Complaint as to Defendant.

7. THE DEWALT Products have been widely promoted, both in the United States and throughout the

world. Consumers, potential customers, and other members of the public recognize the Plaintiff's

products sold in the United States originate exclusively with Plaintiffs. Below is a link and the

screenshot where SBD's authentic DEWALT Products can be purchased from, versus the

counterfeiters selling the illegal product at prices substantially below an original (Pictures and links

from the Complaint have not been copied here for the purposed of Defendant's Answer) The above

example of the Defendant Aliases on the a Defendant Domain Name evidences a cooperative

counterfeiting network using fake eCommerce storefronts designed to appear to be selling authorized

products.

    **ANSWER:** Defendant admits that DEWALT products are well known to the public, but

Defendant lacks knowledge or information sufficient to form a belief as to the allegations of

Paragraph 7 of the Complaint and accordingly denies the same.

8. To be able to offer the counterfeit products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network: Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area. The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world. Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy. *See,* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020,

(https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated- goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 2.**

> **ANSWER:** The allegations in Paragraph 8 of the Complaint are denied as to Defendant. Defendant specifically denies any allegations or implications that it is engaged in counterfeiting or with a counterfeiting group. Defendant cannot admit or deny the veracity of the excerpt from the Homeland Security Report.

9. The Defendant Aliases share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities: The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public. A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third- party online marketplaces greatly complicates enforcement efforts,

especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions. . . Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors. *Id.* at 5, 11, 12

> **ANSWER:** The allegations in Paragraph 9 of the Complaint are denied as to Defendant. Defendant specifically denies any allegations or implications that it is engaged in counterfeiting or with a counterfeiting group or uses aliases or illegal identifiers. Defendant cannot admit or deny the veracity of the excerpt from the Homeland Security Report.

10. eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform. It formed a special task force that worked in conjunction with Chinese authorities for a boots-on-the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

\*\*\* Article entitled "Fighting Chinas counterfeits in the Online Era." *See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm (**Exhibit 3**).

**ANSWER:** Defendant lacks sufficient information about the allegations of Paragraph 10 of the Complaint and denies them as to Defendant.

11. SBD has been and continues to be irreparably damaged through consumer confusion, dilution, loss of control over its reputation and good will as well as the quality of goods bearing the DEWALT Trademarks. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters: Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organization for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810. The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat. Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses. *See, Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**Exhibit 2**) at 4, 8, 11.

**ANSWER:** Defendant lacks information concerning the allegations of Paragraph 11 of the Complaint and the excerpt and denies them as to Defendant, and particularly denies that Defendant is involved in counterfeiting.

12. Not only are the creators and brand holders harmed, the public is harmed as well: The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e- commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers. The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. This illicit trade must be stopped in its tracks.

 **ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny the informational excerpt that Plaintiffs have provided in Paragraph 12 of the Complaint.  Defendant denies that it engages in counterfeiting or illegal activity in its marketing and sales.

13. SBD's investigation shows that the telltale signs of an illegal counterfeiting ring is present in the instant action. For example, Schedule A shows the use of store names by the Defendant Aliases that employ no normal business nomenclature and, instead, have the appearance of being made up, or if a

company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine SBD products, while selling inferior imitations of SBD's products. The Defendant Aliases also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. SBD is forced to file this action to combat Defendants' counterfeiting of SBD's registered trademarks, as well as to protect unknowing consumers from purchasing unauthorized DEWALT products over the Internet.

**ANSWER:** Defendant lacks knowledge or information sufficient to admit or deny the information that Plaintiffs have provided in Paragraph 13 of the Complaint, but denies it as to Defendant and furthermore denies that it engages in counterfeiting or illegal activity in its marketing and sales, and specifically denies that it has engaged in counterfeiting of valid trademarks.

## THE PLAINTIFFS

14. Plaintiff Stanley Black & Decker, Inc. is a corporation duly organized and existing under the laws of the State of Connecticut, with its principal place of business located at 1000 Stanley Drive, New Britain, Connecticut 06053. SBD is the successor-in-interest to The Stanley Works.

**ANSWER:** Admitted on Information and belief

15. Plaintiff The Black & Decker Corporation is a Maryland corporation having its principal place of business at 701 East Joppa Road, Towson, Maryland. The Black & Decker Corporation owns all trademark and trade dress rights relating to the products of Stanley Black & Decker, Inc.

**ANSWER:** Admitted on information and belief

16. SBD is renowned in the U.S. and around the world as a leading manufacturer and marketer of power tools, hand tools, tool kits, and a wide variety of other products for home improvement, consumer, industrial and professional use. Long before Defendants' acts described herein, SBD marketed its products in connection with the DEWALT Trademarks and Trade Dress. Plaintiffs are associated with the DEWALT Brand of power tools. Plaintiffs are the official source of DEWALT products.

**ANSWER:** Admitted on information and belief except that such does not include an admission of the validity of any particular Trademarks or Trade Dress or other proprietary assets that have been asserted by Plaintiffs in this matter.

17. The DEWALT Trademarks have been used exclusively by SBD and have never been abandoned. The DEWALT registrations are valid, subsisting, and in full force and effect. The registrations of the DEWALT Trademarks constitute prima facie evidence of their validity and of SBD's exclusive right to use the DEWALT Trademarks pursuant to 15 U.S.C. § 1057(b).

**ANSWER:** Defendant denies the validity of the DEWALT Trademarks as asserted in Paragraph 17 of the Complaint, and will provide evidence in support of invalidity.

18. The DEWALT Trademarks appear on SBD Products, as well as the packaging and advertisements related to such products. SBD Products have long been desirable and popular.

> **ANSWER:** Defendant admits on information and belief that Plaintiffs use their Trademarks on products, packaging, and advertising. Defendants deny that Plaintiffs Trademarks are valid.

19. SBD has invested substantial time, money and effort in building up and developing consumer recognition, awareness, and goodwill in the DEWALT Products.

> **ANSWER:** Defendant lacks sufficient information to admit or deny this allegation.

20. The Black & Decker Corporation is the exclusive distributor or licensor in the United States of the DEWALT Trademarks and Trade Dress.

> **ANSWER:** Defendant lacks sufficient information to admit or deny this allegation.

21. DEWALT tools and accessories, including battery packs, are sold through nearly all the leading department stores, hardware stores and other legitimate retail outlets such as Home Depot, Lowe's Home Improvement, Ace Hardware, True Value, and other major retailers throughout the United States and in Illinois in this jurisdiction.

> **ANSWER:** This allegation is admitted on information and belief.

22. Since 1992, SBD has spent over half a billion dollars promoting the DEWALT product line and the DEWALT Trademarks and Trade Dress. As a result of Plaintiffs' extensive advertising and promotion of the DEWALT products, and billions of dollars in sales, as well as the inherently

distinctive color trade dress of the DEWALT products, these products have become widely and favorably known and recognized in the trade and among professional purchasers and users of such products as originating with DEWALT and SBD. The DEWALT name and identity have become indicative of high-quality power tools for use in industrial, commercial, professional and "do-it-yourself" applications.

**ANSWER:** Defendant  is unable to admit or deny Plaintiffs' allegations about financial investments  in advertising and promotion of their products. Defendant denies the validity of Plaintiffs' assertion of an inherently distinctive trade dress.

23. As a consequence of these efforts and the enormous popularity of the DEWALT products, the DEWALT name and the yellow and black colors used in the entire DEWALT line have long been associated with Plaintiffs by purchasers and potential purchasers of such products. The non-functional color combination alone attracts customers and creates an immediate association with Plaintiffs' DEWALT product line and quality image.

**ANSWER:** Defendant admits on information and belief that Plaintiffs products are popular and use yellow and black colors, but denies Plaintiffs' allegations concerning validity of proprietary rights in a non-functional trade dress

24. In 1998, Judge Cacheris of the United States District Court for the Eastern District of Virginia issued an extensive opinion finding that Plaintiffs' massive sales and marketing efforts "caused the distinctive yellow and black color scheme on the DEWALT line to achieve consumer recognition soon after its initial launch." *Black & Decker v. Pro-Tech,* 26 F.Supp.2d 834, 851 (E.D. Va. 1998). "Professional power tool users began to associate yellow and black with DEWALT by March

1992...and Plaintiffs' aggressive marketing efforts certainly caused secondary meaning to arise by May of 1992." *Id.*

> **ANSWER:** Defendant admits on information and belief that a judge made these statements in a 1998 case.

25. Survey evidence credited in *Pro-Tech* showed that 95% of the professional power tool users contacted believed that a power tool having yellow and black colors originated with a single source, while 85% of the total correctly associated that color scheme with SBD's or "DEWALT." Related "likelihood of confusion" surveys also elicited repeated, spontaneous mentions of DEWALT and Black & Decker.

> **ANSWER;** Defendant lacks sufficient information about the referenced surveys so as to admit or deny the veracity of Plaintiffs' assertions or conclusions made from them.

26. As a consequence, Judge Cacheris held that Plaintiffs' DEWALT yellow and black colors enjoy "a level of consumer recognition that parallels the extent to which the public associates golden arches with the McDonald's Corporation." *Pro-Tech,* 26 F.Supp.2d at 851. The DEWALT yellow and black color scheme has achieved secondary meaning.

> **ANSWER:** Defendant admits on information and belief that the Judge made the quoted statement. Defendant denies the assertions and conclusions that Plaintiffs make, based on that.

27. In a subsequent lawsuit filed by Plaintiffs against Atlas Copco for its use of an infringing yellow and black color scheme, the court in the Eastern District of Virginia entered a Consent Judgment

Order on January 2, 2001, which "permanently enjoined" Atlas Copco from "selling, marketing or distributing electric power tools and packaging for such tools having a yellow and black color combination."

> **ANSWER:** Defendant admits on information and belief that Plaintiff have quoted the case correctly.

28. On April 10, 2002, the court in the Eastern District of Virginia entered a permanent injunction against other yellow and black tool infringers (Grex Power Tools and Frank Wong) in which Grex acknowledged infringement and that "Black & Decker has valid, enforceable, and protectable trademark and trade dress rights in its yellow and black color scheme for electric power tools and pneumatic tools."

> **ANSWER:** Defendant admits on information and belief that Plaintiff have quoted the case correctly. Defendant denies the validity of Plaintiffs' assertions about its trademark and trade dress.

29. As demonstrated above, SBD has made efforts to protect its interests in and to the DEWALT Trademarks. No one other than SBD and its licensees are authorized to manufacture, import, export, advertise, offer for sale, or sell any goods utilizing the DEWALT Trademarks without the express written permission of SBD.

> **ANSWER:** Defendant admits that Plaintiffs have described, in the above paragraphs, efforts to protect business interests but Defendant lacks sufficient information or knowledge to specifically admit or deny Plaintiffs' assertions about its actual business investments or its licensing policies.

## THE DEFENDANTS

30. Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit DEWALT products to consumers within the United States, including Illinois and in this Judicial District.

> **ANSWER:** In response to these allegations in the Complaint, Paragraph 30, Defendant admits that it is a resident of China. and markets products on the internet to the United States including Illinois and thereby conducts, transacts, and/or solicits business in this judicial district. Defendant denies all other assertions about its selling counterfeit products.

## THE DEFENDANTS' UNLAWFUL CONDUCT

31. The success of the DEWALT brand has resulted in its significant counterfeiting. Plaintiff has identified numerous marketplace listings on eCommerce platforms such as, but not limited to, eBay, WISH, Amazon, DHGate, Aliexpress, and JOOM, including the Defendant Aliases, which have been offering for sale, selling, and importing illegal products to consumers in this Judicial District and throughout the United States. Defendants have persisted in creating the Defendant Aliases and Defendant Internet Stores.

> **ANSWER:** The allegations of Paragraph 31 are denied as to Defendant.

32. eCommerce sales, including eCommerce Internet stores like those of Defendants, have resulted in a sharp increase in the shipment of unauthorized products into the United States. *See* **Exhibit 4**, Department of Homeland Security, *Fiscal Year 2018 Seizure Statistics Report*. According to Customs and Border Patrol's ("CBP") report, over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *Id.* Over 85% of CBP seizures originated from mainland China and Hong Kong. *Id.* Counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

      **ANSWER:** Plaintiffs' allegations of unauthorized sales are denied as to Defendant.

33. Counterfeiting rings are able to take advantage of the anonymity provided by the Internet which allows them to evade enforcement efforts to combat counterfeiting. For example, counterfeiters take advantage of the fact that marketplace platforms do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these Internet platforms." **Exhibit 5**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 41 NW. J. INT'L L. & BUS. 24 (forthcoming 2020). Further, "Internet commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." *Id.* at 25. This lack of meaningful regulation allows the Defendants to garner sales from Illinois residents by setting up and operating eCommerce Internet stores that target United States consumers using one or more seller aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold counterfeit products to residents of Illinois.

**ANSWER:** Plaintiffs' allegations of counterfeiting and unauthorized sales are denied as to Defendant

34. Shrouding their counterfeiting operation in anonymity allows the defendants to operate as a ring of counterfeiters operating on eCommerce sites such as WISH, eBay and, Aliexpress. Plaintiffs' investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, the online storefront names set forth in Schedule A employ unconventional nomenclature designed to conceal identifying information of the true owner. Instead, the seller names appear to be made up aliases. Thus, the Defendant Aliases are using fake online storefronts designed to appear to be selling genuine Plaintiffs products, while selling inferior imitations of Plaintiffs' products.

**ANSWER:** Plaintiffs' allegations of aliases, counterfeiting and unauthorized sales in ecommerce are denied as to Defendant.

35. Another telltale sign of a mutually cooperative counterfeiting ring in operation is that, on information and belief, Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling counterfeit products. Such seller alias registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting cooperation, and to avoid being shut down.

**ANSWER:** Plaintiffs' allegations of aliases, counterfeiting rings and unauthorized sales in ecommerce are denied as to Defendant.

36. On information and belief, the level of cooperation between the Defendants is so significant that they are in constant communication with each other and regularly participate in online private chat

rooms and through websites such as sellerdefense.cn regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits .

> **ANSWER:** Plaintiffs' allegations of counterfeiting, counterfeiting rings and unauthorized sales in ecommerce are denied as to Defendant.

37. Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine DEWALT products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal. Defendant Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. SBD has not licensed or authorized Defendants to use its DEWALT Trademarks and Trade Dress, and none of the Defendants are authorized retailers of genuine DEWALT products.

> **ANSWER:** Plaintiffs' allegations of deceptive websites, counterfeiting and unauthorized sales in ecommerce are denied as to Defendant.

38. Upon information and belief, Defendants also deceive unknowing consumers by using the DEWALT Trademarks and Trade Dress without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for DEWALT products. Additionally, upon information and

belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine DEWALT products.

> **ANSWER:** All allegations in Paragraph 38, especially allegations about deception of consumers, are denied as to Defendant.

39. Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the DEWALT Trademarks, including its exclusive right to use and license such intellectual property and the goodwill associated therewith.

> **ANSWER:** Defendant is aware of the DEWA]LT brand but denies the validity of asserted proprietary rights. Defendant denies all other allegations in Paragraph 39.

40. Defendants often go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their network of Defendant Internet Stores. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

> **ANSWER:** All of the allegations of Paragraph 40 are denied as to Defendant.

41. Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. For example, the counterfeit DEWALT products for sale in the

Defendant Internet Stores bear similarities and indicia of being related to one another, suggesting that the counterfeit DEWALT products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. Such commonalities include incomplete logos, improper spelling and other written materials.

**ANSWER:** All of the allegations of Paragraph 41 are denied as to Defendant.

42. The Defendant Aliases also include other notable common features, including lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

**ANSWER:** All of the allegations of Paragraph 42 are denied as to Defendant.

43. Further, counterfeiters, such as Defendants, typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of SBD's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

**ANSWER:** All of the allegations in Paragraph 43 are denied as to Defendant

## COUNT I

## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

44. SBD repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

**DOES NOT REQUIRE AN ANSWER**

45. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of the registered DEWALT Trademarks and Trade Dress in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The DEWALT Trademarks and Trade Dress are highly distinctive. Consumers have come to expect the highest quality from SBD's products provided under the DEWALT Trademarks and Trade Dress.

**ANSWER:** Admitted as to the correctness that this is a trademark infringement action, but Defendant denies allegations concerning trademark validity and infringement by and as to Defendant

46. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products in connection with the DEWALT Trademarks and Trade Dress without SBD's permission.

**ANSWER:** Defendants admits to having sold, offered to sell, marketed, distributed, and advertised, and selling, offering to sell, marketing, distributing, and advertising products, but Defendant denies all assertions in connection with using valid Trademarks and/or Trade Dress without Plaintiffs' permission .

47. SBD is the exclusive owner of the trademark. SBD's United States Registrations for the DEWALT Trademarks and Trade Dress (**Exhibit 1**) are in full force and effect. Upon information and belief, Defendants have knowledge of SBD's rights in the DEWALT Trademarks and Trade Dress, and are willfully infringing and intentionally using counterfeits of the DEWALT Trademarks

and Trade Dress. Defendants' willful, intentional and unauthorized use of the trademark is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit goods among the general public.

**ANSWER:** Defendant Denies validity of Plaintiffs' asserted Trademarks and Trade Dress and all allegations that Defendant has infringed OR committed unauthorized use of valid Trademarks and/or Trade Dress. Defendant denies all allegations as to counterfeiting or confusion or damage to the public.

48. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

**ANSWER:** The allegations of Paragraph 48 are denied as to Defendant.

49. SBD has no adequate remedy at law, and if Defendants' actions are not enjoined, SBD will continue to suffer irreparable harm to its reputation and the goodwill of its well-known DEWALT Trademarks and Trade Dress.

**ANSWER:** The allegations of Paragraph are denied as to Defendant

50. The injuries and damages sustained by SBD have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit or infringing DEWALT products.

**ANSWER:** The allegations in Paragraph 50. Are denied as to Defendant.

## COUNT II
### FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

51. SBD repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

**THIS REQUIRES NO ANSWER**

52. Defendants' promotion, marketing, offering for sale, and sale of counterfeit or infringing DEWALT products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with SBD or the origin, sponsorship, or approval of Defendants' counterfeit DEWALT products by SBD.

**ANSWER**: The allegations of Paragraph 52 are denied as to Defendant

53. By using the DEWALT Trademarks and Trade Dress in connection with the sale of counterfeit or infringing DEWALT products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the counterfeit or infringing DEWALT products.

**ANSWER**: The allegations of Paragraph 53 are denied as to Defendant.

54. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the counterfeit or infringing DEWALT products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

**ANSWER:** The allegations of Paragraph 54 are denied as to Defendant.

55. SBD has no adequate remedy at law and, if Defendants' actions are not enjoined, SSBD will continue to suffer irreparable harm to its reputation and the goodwill of its brands.

**ANSWER:** The allegations of Paragraph 56 are denied as to Defendant.

## COUNT III

## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILCS § 510, et *seq*.)

56. SBD repeats and incorporates by reference herein its allegations contained in the above paragraphs of this Complaint.

**THIS REQUIRES NO ANSWER**

57. Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their counterfeit or infringing DEWALT products as those of SBD, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine DEWALT products, representing that their products have SBD's approval or authorization when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

**ANSWER:** The allegations of Paragraph 57 are denied as to Defendant.

58. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

**ANSWER:** The allegations of Paragraph 58 are denied as to Defendant

59. SBD has no adequate remedy at law, and Defendants' conduct has caused SBD to suffer damage to its reputation and goodwill. Unless enjoined by the Court, SBD will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

**ANSWER:** The allegations of Paragraph 59 are denied as to Defendant

## COUNT IV

## CIVIL CONSPIRACY

60. Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

**THIS DOES NOT REQUIRE AN ANSWER**

61. Plaintiffs are informed and believe and thereon allege that Defendants knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, a concerted and collaborated effort to maintain the distribution, marketing, advertising, shipping, offering for sale, or sale of fake DEWALT Products in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, et seq.

**ANSWER:** The allegations of Paragraph 61 are denied as to Defendant

62. The intent purpose and objective of the conspiracy and the underlying combination of unlawful acts and misconduct committed by the Defendants was to undermine SBD and its business by unfairly competing against it as described above.

**ANSWER:** The allegations of Paragraph 62 are denied as to Defendant

63. The Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, to further accomplish the foregoing intent, purpose and objective. Thus, by entering into the conspiracy, each Defendant has deliberately, willfully and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

**ANSWER:** The allegations of Paragraph 63 are denied as to Defendant

64. As a direct and proximate cause of the unlawful acts and misconduct undertaken by each Defendant in furtherance of the conspiracy, SBD has sustained, and unless each Defendant is restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which SBD has no adequate remedy at law.

**ANSWER:** The allegations of Paragraph 64 are denied as to Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, SBD prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

1. using the DEWALT Trademarks and Trade Dress or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine DEWALT product or is not authorized by SBD to be sold in connection with the DEWALT Trademarks and Trade Dress;

2. passing off, inducing, or enabling others to sell or pass off any product as a genuine DEWALT product or any other product produced by SBD that is not SBD's or not produced under the authorization, control, or supervision of SBD and approved by SBD for sale under the DEWALT Trademarks and Trade Dress;

3. committing any acts calculated to cause consumers to believe that Defendants' counterfeit DEWALT products are those sold under the authorization, control, or supervision of SBD, or are sponsored by, approved by, or otherwise connected with SBD;

4. further infringing the DEWALT Trademarks and Trade Dress and damaging SBD's goodwill;

5. otherwise competing unfairly with SBD in any manner;

6. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for SBD, nor authorized by SBD to be sold or offered for sale, and which bear any SBD trademark, including the DEWALT Trademarks and Trade Dress, or any reproductions, counterfeit copies, or colorable imitations thereof;

7. using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, or any other Online Marketplace Account that is being used to sell or is the means by which Defendants could continue to sell counterfeit DEWALT products; and

8. operating and/or hosting websites operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the DEWALT Trademarks and Trade Dress or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine DEWALT product or not authorized by SBD to be sold in connection with the DEWALT Trademarks and Trade Dress;

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon SBD a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

3) Entry of an Order that, upon SBD's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as, but not limited to, Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, shall:

1. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit DEWALT products using the DEWALT Trademarks and Trade Dress, including any accounts associated with the Defendants listed on Schedule A;

2. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit DEWALT products using the DEWALT Trademarks and Trade Dress; and

3. take all steps necessary to prevent links to the Defendant Internet Stores identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Internet Stores from any search index.

4) That Defendants account for and pay to SBD all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the DEWALT Trademarks and Trade Dress be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that SBD be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the DEWALT Trademarks and Trade Dress;

6) That SBD be awarded its reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

**ANSWER:** Defendant denies that Plaintiffs are entitled to any relief, let alone the relief requested in the Prayer for Relief. Any allegations of infringement, conspiracy or deceptive trade practices contained in the Prayer for Relief of the Complaint as to Defendant are denied.

## AFFIRMATIVE DEFENSES

Without conceding that any of the following necessarily must be pleaded as an affirmative defense or that any of the following is not already at issue by virtue of the foregoing responses to Plaintiff's allegations, Defendant hereby asserts the following defenses. Defendant reserves the right to amend or supplement its affirmative defenses.

### First Affirmative Defense

1. The Complaint, or one or more of the counts set forth therein, fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

2. Plaintiffs' claims are barred by the equitable doctrines of laches, waiver, estoppel, and/or acquiescence.

### Third Affirmative Defense

3. Plaintiffs' claims are barred by the equitable doctrine of unclean hands.

### Fourth Affirmative Defense

4. Plaintiffs cannot show irreparable injury, and therefore is not entitled to injunctive relief.

### Fifth Affirmative Defense

5. Plaintiffs' Complaint against Defendant is barred, in whole or in part, to the extent that it arises from conduct not attributable to Defendant.

### Sixth Affirmative Defense

6. Plaintiffs' Complaint is barred, in whole or in part, because any damages allegedly suffered by Plaintiffs were the result, in whole or in part, of Plaintiffs' own legal fault, and any recovery should be reduced in proportion to their individual and collective fault.

### Seventh Affirmative Defense

7. Plaintiffs' Complaint is barred, in whole or in part, because of Plaintiff's failure to mitigate their alleged damages, if any.

### Eighth Affirmative Defense

8. Defendant reserves the right to allege additional affirmative defenses as they may become known during the course of discovery, and hereby specifically reserves the right to amend its Answer to Plaintiffs' Complaint to allege said defenses at such time as they become known.

### DEFENDANT'S PRAYER FOR RELIEF AS TO PLAINTIFFS' COMPLAINT

WHEREFORE, Defendant respectfully demands that judgment be entered against Plaintiffs as follows:

1. That Plaintiffs take nothing by its Complaint, as to Defendant;

2. That Plaintiffs' Complaint be dismissed with prejudice, as to Defendant;

3. That Defendant be awarded its costs of suit, prejudgment interest and attorneys' fees incurred in connection with this lawsuit; and

4. That Defendant be awarded such other relief as the Court deems just, lawful, or equitable.

## DEFENDANT'S COUNTERCLAIMS

For its Counterclaims against Plaintiffs and Counterclaim-Defendant SBD, Defendant and Counterclaim-Plaintiff XGPower alleges as follows:

## PARTIES

1. Defendant and Counterclaim-Plaintiff XGPower is a Chinese corporation with its principal place of business in Shenzen, China.

2. On information and belief, Plaintiff and Counterclaim-Defendant Black and Decker Corporation is a Maryland corporation having its principal place of business at 701East Joppa Road, Towsen, MD 21032.

3. On information and belief, Plaintiff and Counterclaim-Defendant Black and Decker Inc. is a Connecticut corporation having its principal place of business at 1000 Stanley Drive, New Britain Connecticut 06053.

## JURISDICTION AND VENUE

3. This action arises pursuant to the trademark laws of the United States, 15 U.S.C. § 1051 et seq., 15 U.S.C. § 1125(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338.

5. This Court has personal jurisdiction over Counterclaim-Defendants because they have substantial contacts and conduct substantial business in the state of Illinois, in this judicial district.

## FACTUAL BACKGROUND

6.      Counterclaim-Plaintiff manufactures and sells products which it has designed.

7.      Counterclaim-Plaintiff sells its products via a variety of methods available on the internet, including direct to customers, and through websites which host third party marketplace systems such as Amazon.com.

8.      Counterclaim-Plaintiff has and practices a lawful and compliant business.


<u>COUNTERCLAIM-DEFENDANT'S ACTS COMPRISING ACTUAL CONTROVERSY</u>

9.      Counterclaim-Defendants have made false assertions of infringement of alleged trademarks, and trade dress, that were directed at Counterclaim-Plaintiff.

10.     Counterclaim-Defendants, after claiming that Counterclaim-Plaintiff's products infringe its proprietary rights, have already taken strong action to stop Counterclaim-Plaintiff's sales of Counterclaim-Plaintiff's lawful products.

11.     These actions have included the instant lawsuit filed by Counterclaim-Defendants, and complaints to Amazon.com and other sites, and the freezing of financial assets in Paypal and E-bay accounts.  The freezing of Paypal and E-bay assets has enveloped proceeds from the sale of Counterclaim-Plaintiffs products that are outside the scope of this matter, and thus redoubling the damages to Counterclaim-Plaintiff

12.     Due to these complaints by Counterclaim-Defendants, Counterclaim-Plaintiffs' products, previously lawfully sold, have been restricted from sale on these sites. Such stoppage of sales was sought and specifically requested by Counterclaim-Defendant.

13.     Counterclaim-Defendants have therefore attempted and succeeded in stopping Counterclaim-Plaintiff's sales of its lawful products by its misrepresentations without any evidence, proven intellectual property rights, or foundation for its complaints.

14.     Such deactivation and stoppage of Counterclaim-Plaintiff's sales have directly caused substantial damages to Counterclaim-Plaintiff, which continue at the time of this filing.

15.     Counterclaim-Defendants have therefore directly damaged Counterclaim-Plaintiff, with such damages continuing to be incurred.

<u>CLAIMS FOR RELIEF</u>

COUNT 1

(Declaratory Judgment of Noninfringement of Trademark or Trade Dress)

16.     Plaintiff incorporates by reference and realleges paragraphs 1 through 15 above as though fully set forth herein.

17.     This is a declaratory judgment action under the trademark laws of the United States, 15 U.S.C. § 1051 et seq., 15 U.S.C. § 1125(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

18.     Counterclaim-Defendants have created a present and actual controversy between Plaintiff and Counterclaim-Defendant concerning the matter of whether Plaintiff's products infringe one or more of Counterclaim-Defendant's trademarks, and/or trade dress rights.

19.     As an actual justiciable controversy exists by way of the credible threat of the instant litigation and demand to cease and desist manufacture of Counterclaim-Plaintiff's products and subsequent forbearance of manufacture of other similar products, Plaintiff seeks relief from this Court.

20.     The manufacture, use, sale and offer of sale of products by Counterclaim-Plaintiff does not infringe any trademark rights or trade dress rights claimed by Counterclaim-Defendants.

21.     Counterclaim-Plaintiff is entitled to declaratory judgment that it is not infringing, has not infringed, and is not liable for infringing any allegedly enforceable trademark rights or trade dress

rights owned by Counterclaim-Defendants, either directly or by inducing others to infringe or by contributing to infringement by others.

## COUNT II

### (Declaratory Judgment of Unenforceability of Trademark or Trade Dress)

22.     Plaintiff incorporates by reference and realleges paragraphs 1 through 21 above as though fully set forth herein.

23.     This is a declaratory judgment action under the trademark laws of the United States, 15 U.S.C. § 1051 et seq., 15 U.S.C. § 1125(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

23.     Counterclaim-Defendants have created a present and actual controversy between Counterclaim-Plaintiff and Counterclaim-Defendants concerning the matter of whether Counterclaim-Plaintiff's products infringe one or more of Counterclaim-Defendant's trademarks. or tradedress

24.     As an actual justiciable controversy exists by way of the credible threat of the instant litigation and demands to cease and desist the sale of Counterclaim-Plaintiff's products, Plaintiff seeks relief from this Court.

25.     Plaintiff requests an order declaring that Counterclaim-Defendants' alleged trademarks, and or trade dress which was asserted by Counterclaim-Defendants, because of being merely descriptive, functional, generic, and not having inherent distinctive element, lack the requisite elements to be protectable on the Principal Register and to be enforceable.

26.     Plaintiff requests an order declaring that Counterclaim-Defendants' alleged trade dress rights, which were asserted by Counterclaim-Defendants, lack the requisite elements to be protectable on the Principal Register and to be enforceable.

COUNT III

(Federal Unfair Competition)

27.     Plaintiff incorporates by reference and realleges paragraph 1 through 26 above as though fully set forth herein.

28.     Counterclaim-Defendants' objectively and subjectively baseless assertions of trademark infringement, and trade dress infringement, against Counterclaim-Plaintiff, made in  complaints, constitute bad faith commercial statements made in an attempt to divert customers from Plaintiff and to otherwise injure Plaintiff's ability to compete, and have unlawfully diverted trade, goodwill, and revenue from Plaintiff.

29.     Counterclaim-Defendants have been and are being unjustly enriched with other benefits proximately caused by and/or resulting from their unlawful acts as alleged herein, in violation of 15 U.S.C. § 1125.

30.     The actions of Counteclaim-Defendants alleged in this complaint have caused and will continue to cause substantial and irreparable harm, damage and injury to Plaintiff for which Plaintiff has no fully adequate remedy at law, and will continue unless and until enjoined and restrained by this Court.

PRAYER FOR RELIEF AS TO COUNTERCLAIMS

WHEREFORE, Counterclaim-Plaintiff asks this Court to enter judgment in their favor against Counterclaim-Defendants and grant the following relief, as to all claims for relief:

1.     An order declaring that the manufacture, use, sale and/or offer of sale of products manufacturedor sold by Counterclaim-Plaintiff do not infringe any valid, distinctive and enforceable trademark rights allegedly owned by Counterclaim-Defendants.

2.     An order declaring that the trademark rights allegedly owned by Counterclaim-Defendants are unenforceable.

3.     An order declaring that the manufacture, use, sale and/or offer of sale of products manufactured by Counterclaim-Plaintiff do not infringe any valid, distinctive and enforceable trade dress rights allegedly owned by Counterclaim-Defendants.

4.     An order declaring that the trade dress rights allegedly owned by Counterclaim-Defendants are unenforceable.

5.     That the court award Counterclaim-Plaintiff its damages and Counterclaim-Defendants' profits resulting from Counterclaim-Defendants' unfair competition.

6.     An award to Counterclaim-Plaintiff of actual damages adequate to compensate Counterclaim-Plaintiff for Counterclaim-Defendants' wrongful actions which have caused Counterclaim-Plaintiff damages, including Counterclaim-Defendants' false claims made to stop Counterclaim-Plaintiff's products from sale;

7.     That the court award Counterclaim-Plaintiff its reasonable attorneys' fees, costs, and expenses pursuant to 17 U.S.C § 512(f), or where available or allowed by law;

8.     That the court award punitive damages in an amount to be determined at trial, where available;

9.     Any further relief that this Court deems just and proper.

Dated: January 21, 2021          XG Power

By: s/ Mark E. Wiemelt
Mark E. Wiemelt

Mark E. Wiemelt (06208213)
LAW OFFICES OF MARK E. WIEMELT, P.C.
31 E. Odgen Ave., #123
LaGrange, Illinois 60525
Ph: (312) 498-3377
E-mail: mark@wiemeltlaw.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on January 20, 2021, he caused a true and complete copy of the foregoing **DEFENDANT XG POWER'S ANSWER TO PLAINTIFFS' COMPLAINT** to be served via the Court's CM/ECF system upon the following parties:

Keith A Vogt, Esq
Keith Vogt, Ltd.
111 W. Jackson Blvd. Suite 1700
Chicago Illinois 60604
Telephone: 312-675-6079

/s/ Mark E. Wiemelt